**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 07-23156—CIV-MOORE/O'Sullivan**

**ROGER JIMENEZ,**

**Plaintiff,**

**v.**

**SOUTHERN PARKING, INC.; WILLIAM KENT and JOSE A. CONTRERAS**

**Defendant.**
**_________________________________/**

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEORANDUM OF LAW**

Come now the Defendants, SOUTHERN PARKING, INC. ("SPI"); WILLIAM KENT ("KENT"); and JOSE A. CONTRERAS ("CONTRERAS"), pursuant to Fed. R. Civ. P. 56 and Local Gen. R. 7.5, and hereby move this Honorable Court for an order granting them summary judgment in the above-referenced matter, and show as follows:

1. As shown in the accompanying Statement of Undisputed Facts as to Which There is No Genuine Issue to be Tried, filed simultaneously herewith, taking all of the undisputed facts as gleaned from all the evidence of record as true, and drawing every inference in favor of the non-movant Plaintiff ROGER JIMENEZ ("JIMENEZ"), the Defendants are entitled to judgment as a matter of law pursuant to well established statutory and case precedent.

WHEREFORE, Defendants SPI, KENT and CONTRERAS respectfully submit that summary judgment should be entered on their behalf and against the Plaintiff, JIMENEZ, in full, and further request such other and further relief as the Court shall deem just and reasonable.

# MEMORANDUM OF LAW

## A. Applicable Principles

Pursuant to Fed. R. Civ. P. 56(c), a moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law". The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248 (1986); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

As the Supreme Court of the United States held in *Celotex v.Catrett*, 477 U.S. 317, 322 (1986):

> In our view, the plain language of [Rule] 56(c) mandates the entry of Summary Judgment, after adequate time for discovery and upon motion, [against] a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact since a complete failure of proof concerning an essential element of [the] non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of [his] case with respect to [which] he has the burden of proof.

Once the undisputed facts have been ascertained, "the Judge's function is not himself to weigh the evidence and to determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 475 U.S. 242, 249 (1986). There can be no issue for trial unless there is sufficient evidence upon which the trier of fact may find in favor of the non-moving party. *Id*.

## B. Jimenez Cannot Recover Because He Cannot Legally Work in the United States

By his own admission, Jimenez is a Costa Rican who visited this country numerous times as a tourist in the past (SOF ¶5).[1] Although Jimenez refused to answer questions as to his current immigration status; *i.e.*, whether he is in the United States legally, he did admit that he has no current permit to work in the United States and indeed, has never had one (SOF ¶ 5). The United States Supreme Court, in *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137 (2002), had occasion to review an order of the NLRB which found that an employee who had been laid off in retaliation for his pro-union activity, a violation of §§ 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3), was entitled to back pay even though the employee was an undocumented alien who was never legally authorized to work in the United States. The Board, in so holding, was following the Supreme Court's prior decision in *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883 (1984). In *Sure-Tan*, the Court held that under the old immigration laws, it would not be a conflict to apply the NLRA to unfair labor practices which affected such undocumented alien workers, although the remedies would be limited. By the time *Hoffman* was decided, however, Congress had passed the Immigration Reform and Control Act of 1981, ("IRCA"), 8 U.S.C. § 1324a. IRCA represented "a comprehensive scheme prohibiting the employment of illegal aliens in the United States." *Hoffman*, *id.* at 147. As the Court noted in *INS v. National Center for Immigrants' Rights, Inc.*, 502 U.S. 183, 194 and n. 8 (1991), IRCA now incorporated "combating the employment of illegal aliens central to 'the policy of immigration law.'" The fact that enforcement of the national immigration policy has in fact been transferred from the Department of Justice to the Department of Homeland Security drives home the fact that the problem of employing undocumented and illegal alien workers is very serious indeed.

[1] "SOF" references are to the Statement of Material Facts as to Which There is No Genuine Issue to be Tried submitted simultaneously herewith. "A." references are to the Appendix materials submitted as an exhibit to the SOF.

As the *Hoffman* Court found:

> Under the IRCA regime, it is impossible for an undocumented alien to obtain employment in the United States without some party directly contravening explicit congressional policies. Either the undocumented alien tenders fraudulent identification, which subverts the cornerstone of IRCA's enforcement mechanism, or the employer knowingly hires the undocumented alien in direct contradiction of its IRCA obligations. The Board asks that we overlook this fact and allow it to award backpay to an illegal alien for years of work not performed, for wages that could not lawfully have been earned, and for a job obtained in the first instance by a criminal fraud. We find, however, that awarding backpay to illegal aliens runs counter to policies underlying IRCA, policies the Board has no authority to enforce or administer. Therefore, as we have consistently held in like circumstances, the award lies beyond the bounds of the Board's remedial discretion.

*Id.*, at 149. It stands to reason that the same legal and policy considerations which would prevent the NLRB from remedying unfair labor practices would similarly prevent remedying unlawful employment practices prohibited by the FLSA. In fact, the Eleventh Circuit has not decided this issue, but its prior holding in *Patel v. Quality Inn South*, 846 F.2d 700 (11th Cir. 1988) would seem to support such a conclusion. In *Patel*, the plaintiff was a native of India in the United States on a visitor's visa, and overstayed the length of the visa. He then began working for the defendant hotel doing various tasks which were overtime non-exempt under the FLSA. He sued, and the district court advised the defendant hotel to file a motion for summary judgment on the grounds that as an undocumented alien, the plaintiff should not be able to recover. The defendant did so, and the court asked the U.S. Department of Labor to file a statement of position on the issue. The DOL did so, opining that undocumented aliens were subject to the protections of the FLSA and should be able to recover for a violation.

The Eleventh Circuit agreed with the DOL, especially noting the *Sure-Tan* decision, and the similar humanitarian goals of both the FLSA and the NLRA. In then considering the effects

of IRCA, the court first noted that nothing in IRCA suggested a Congressional intent to limit the rights of illegal aliens under the FLSA. Moreover, the court held:

> Indeed, the FLSA's coverage of undocumented aliens goes hand in hand with the policies behind the IRCA. Congress enacted the IRCA to reduce illegal immigration by eliminating employers' economic incentive to hire undocumented aliens. To achieve this objective the IRCA imposes an escalating series of sanctions on employers who hire such workers. [citation omitted]. The FLSA's coverage of undocumented workers has a similar effect in that it offsets what is perhaps the most attractive feature of such workers---their willingness to work for less than minimum wage. If the FLSA did not cover undocumented aliens, employers would have an *incentive* to hire them. Employers might find it economically advantageous to hire and underpay undocumented workers and run the risk of sanctions under the IRCA.

*Id.*. at 704. This decision, however, antedated the Supreme Court's *Hoffman* decision by 14 years. Perhaps most notably, the *Patel* decision was decided just seven years after the IRCA's passage, while the Supreme Court's *Hoffman* decision had the benefit of 21 years of seeing how IRCA was faring.[2] Given the Supreme Court's policy considerations in *Hoffman*, it is highly doubtful that the Eleventh Circuit would come to the same conclusion as to the beneficence of the FLSA toward undocumented workers were the issue before it today. Accordingly, Jimenez should be precluded from recovering simply on the basis that his knowingly taking a job in

[2] While it is true that there have been some post-*Hoffman* decisions by lower courts which have, despite that decision, applied FLSA protection to undocumented alien workers, they appear to have done so on the basis that there was a distinction between back pay for labor performed, as in a FLSA case, and labor not performed as in the *Hoffman* case. *See, e.g., Cortez v. Medina's Landscaping, Inc.,* 2002 WL 31175471 (N.D. Ill. 2002). That is not, however, a particularly sensible distinction, as it simply rests on the differences between the evils addressed by the FLSA and the NLRA. The FLSA addresses workers who are paid less than the minimum wage and/or no overtime, which are by their very nature always prospective, while the NLRA addresses unlawful retaliation for engaging in protected concerted activity such as union organizing, usually by termination, the relief for which would by its very nature be retroactive. Therefore, rather than focusing on whether the relief would be retroactive or prospective, the court's focus should be on whether IRCA, with its stringent stance against the employment of illegal aliens, makes any protection afforded by these antecedent humanitarian pieces of legislation inapplicable to those workers who are knowingly here illegally and nevertheless break the laws of the United States by taking jobs they are simply not entitled to have.

violation of federal law bars him from the protections of that same federal law under which he now seeks shelter.[3]

### C. Jimenez Was Not Employed in an Enterprise Affecting Commerce

Although his Complaint is hardly a model of clarity, Jimenez appears to be alleging that he was employed in an enterprise engaged in commerce within the meaning of §3(s)(2) of the FLSA, 29 U.S.C. § 203(s)(2). Jimenez appears to be claiming that Defendants SPI, Kent and Contreras all owned and operated the car wash business at the 6000 building at Williams Island, such that they are all related in that ownership and operation through a unified operation or common control for a common business purpose, thus constituting an "enterprise" within the meaning of §3(r) of the FLSA. The undisputed facts, however, belie this contention.

In fact, neither SPI nor Kent had any ownership interest in the car wash. While it is true that they operated a valet parking business at that location, the valet parking was separate and independent of the car wash (SOF ¶ 13). SPI did not provide car wash services to its valet parking customers (SOF ¶ 13). Neither Kent nor SPI provided any supplies for the car wash. They realized no income from the car wash. They did not hire or employ anyone to work at the car wash. They did not pay anyone who worked at the car wash. While SPI's employees valet parked cars and wore specific uniforms, Jimenez wore no uniform and only parked cars sometimes and then only after washing them. Jimenez also washed vehicles which were not parked by SPI's employees (SOF ¶¶ 1, 2, 8, 11, 13, 15, 17).

SPI requires all of its employees to come to its office on South Dixie Highway to fill out applications for employment, present their documents such as Social Security cards and drivers'

[3] This is particularly *apropos* since Jimenez appears to be making his living off of FLSA overtime lawsuits. Three months after he returned to the United States in January 2006, he took his first job illegally as an undocumented alien, and sued that employer for unpaid overtime using the same counsel who represent him in the instant case. (A. 4, pp. 6-7, 20-21).

licenses to the Human Resources department, and be assigned to their work locations (SOF ¶ 3). Jimenez never went to SPI's office, never produced any documentation, including a driver's license, and never filled out employment or tax documents (SOF ¶¶ 6, 7).

Instead, Jimenez "applied" for a job washing the cars at the 6000 building directly with Contreras (SOF ¶ 5). Contreras had no hiring authority over SPI employees (SOF ¶ 9). Contreras negotiated Jimenez's pay with Jimenez (SOF ¶ ¶ 10, 11). On the other hand, Contreras does not determine pay for SPI's employees, nor does he know what they make (SOF ¶ 11). Contreras paid Jimenez directly in cash, or once or twice through his personal checking account (SOF ¶ 18). The SPI employees, however, were paid through SPI with checks from ADP, a payroll company utilized by SPI (SOF ¶ 11).

Contreras had no ownership interest in SPI (SOF ¶ 13). Nor did he have any operational or financial control over SPI (SOF ¶ 13). Contreras had been washing cars at the 6000 building since before people even began living there; he would wash the vehicles of the workers who were there (SOF ¶ 6). The car wash was completely separate and independent of Contreras's work for SPI as a valet manager (SOF ¶ 6).

Based on this evidence, there is, as a matter of law, no "enterprise" within the meaning of §§ 3(s)(2) and 3(r) of the FLSA.

> The determination as to whether two businesses constitute a single enterprise for purposes of the FLSA is an issue to be resolved case by case based upon the particular facts of each case [citations omitted]. There must coexist three elements before defendants' activities can be considered a single enterprise: (1) related activities, (2) performed through unified operations or common control, (3) for a common business purpose.

*Donovan v. Star Bakery, Inc.*, 626 F. Supp 1208, 1212-1213 (D.P.R. 1986), citing *Brennan v. Arnheim & Neely, Inc.*, 410 U.S. 512 (1973), *reh.denied*, 411 U.S. 940 (1973). *See*

*also, Donovan v. Easton Land & Development, Inc.*, 723 F.2d 1549, 1551 (11th Cir. 1984); *Wirtz v. Welfare Finance Corp.*, 263 F.Supp. 229 (N.D.W. Va. 1967). In the instant case, it is obvious that none of the three factors for the establishment of an "enterprise" is present.

First, the activities themselves are unrelated. "Activities are related when they are 'the same or similar' or when they are 'auxiliary and service' activities.'" *Easton, supra*, 723 F.2d at 1551. The concept of relatedness also involves "…activities involving 'operational interdependence in fact." *Id.*, quoting *Brennan v. Veterans Cleaning Service, Inc.*, 482 F.2d 1362, 1367 (5th Cir. 1966).[4] In the instant case, while parking cars and washing them may be convenient luxuries to the residents and guests of the 6000 building of Williams Island, they are operationally independent. The valet parking operation is solely owned and operated by SPI and Kent, while the car wash service is owned and operated by Contreras separate and apart from his duties as a valet manager with SPI. Indeed, the car wash washes cars that never come into the hands of the SPI valets (SOF ¶ 13). And if Jimenez, who worked within the car wash, actually parked any of the vehicles, it was once they were already within the parking structure, as the car wash is located on the third floor (A. 4, p. 19). Even then, SPI valets would come and take the vehicles which Jimenez had finished washing and park them (SOF ¶ 17). It is thus clear that parking a car and washing it is not the same function or operation, and one could easily exist without the other. Not everyone who valet parks gets his or car washed, and vice versa. Thus, the record evidence militates against a finding of operational interdependence.

As to the next factor, unified operation or common control, the evidence even more clearly shows that there is no enterprise. It is clear that Contreras controls the car wash operation, and SPI controls the valet parking. The only common factor between the two is that

[4] Decisions of the former Fifth Circuit rendered prior to October 1, 1981 are binding precedent in the Eleventh Circuit under *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(*en banc*)..

Contreras also works as a valet manager for SPI. However, Contreras has no managerial or operational control over SPI, and neither SPI nor Kent have any over the car wash. They do not interchange employees or equipment; indeed, Jimenez was never employed by SPI. Contreras engaged Jimenez to wash cars and was responsible for paying him, while SPI hired and paid the valets on separate books and out of separate accounts. While Jimenez may have punched the same time clock as SPI's valets, Contreras calculated Jimenez's pay directly from the time cards, while the valets' time was converted into time logs and sent to SPI, thence to ADP for payment. Indeed, Kent did not even know that the 6000 building had a time clock or that the SPI employees even used it until this lawsuit arose (A. 3, p. 9). Moreover, the time clock was also used by the employees of a cleaning company which was wholly unrelated to SPI or the car wash (SOF ¶ 12). "In assessing whether the requisite 'common control' is present, the determinative question is whether a common entity has the power to control the related business operation.'" *Star Bakery, supra*, 626 F.Supp. at 1214, citing *Shultz v. Mack Farland and Sons Roofing Co.*, 413 F.2d 1296, 1301 (5th Cir. 1969). *See also, Nelson v. Long Lines Ltd.*, 335 F.Supp.2d 944, 966 (N.D. Iowa 2004)(in determining whether there is common control, courts heavily emphasize common ownership); *Welfare Finance Corp., supra*, 263 F.Supp. at 233 (multi-branch installment loan business); *Easton, supra*, 723 F.2d at 1552-1553 (common ownership of both hotel and lounge constitutes common control). In the case at bar, however, the car wash and the valet parking service were not under common direction and control; Contreras had no control over SPI and SPI clearly had no control over any aspect of the car wash.

Nor does the third and final factor suggest that SPI and the car wash have a common business purpose. "Activities are performed for a common business purpose of they are 'directed toward the same business objective or to similar objectives in which the group has an

interest.'" *Nelson, supra,* 335 F.Supp.2d at 966. *See also,* 29 C.F.R. § 779.213. Many of the factors which go to establishing whether the two businesses are engaged in "related activities " are also relevant in determining a common business purpose. *Easton, supra*, 723 F.2d at 1553. In the instant case, as demonstrated at p. 8 *supra*, the valet parking and the car wash are wholly unrelated. In addition, they are separate entities trying to achieve separate incomes and separate profits. There was no intermingling of profits, or of anything else, for that matter. *Id.* Therefore, there is no evidence of a common business purpose. Accordingly, since the car wash is not an enterprise with SPI as a matter of law, and the car wash does not make the requisite $500,000.00 in gross revenue by itself (SOF ¶ 21), summary judgment must be granted to all Defendants on this issue. *Nelson, supra,* 335 F.Supp.2d at 967.

**D. SPI and the Car Wash Were Not Joint Employers of Jimenez**

Again, although the Complaint is not a model of clarity, the Plaintiff appears to be contending that, even if SPI[5] and the car wash were not an "enterprise" within the meaning of § § 3(r) and 3(s) of the FLSA, they are nevertheless joint employers sufficient to bring the car wash within the ambit of the Act as SPI is in fact a covered employer. 29 C.F.R. §791.2(a). Whether two entities are joint employers is not determined by traditional common law principles for purposes of the FLSA; rather, it depends upon "'the economic reality' of the 'circumstances of the whole activity….'" *Antenor v. D & S Farms*, 88 F.3d 925, 931 (11th Cir. 1996), quoting *Hodgson v. Griffin & Brand of McAllen, Inc.*, 471 F.2d 235, 237 (5th Cir. 1973), *cert. denied*, 414 U.S. 819 (1973). This is referred to as the "economic realities" test and depends upon "the total work arrangement." *Id.* The Eleventh Circuit identified at least eight factors which can be used

[5] Kent has been named as a Defendant only because he has operational control over SPI (A. 5, ¶ 3). Accordingly, if SPI is not Jimenez's employer, and not an "enterprise" or joint employer with the car wash, then Kent is entitled to summary judgment along with SPI for the same reasons. Therefore, all references to SPI will include Kent.

as guidelines to determine whether, under the economic realities test, there is a joint employer relationship between two otherwise unrelated entities:

> (1) the nature and degree of the [putative joint employer's] control of the [putative worker]; (2) the degree of the [putative joint employer's] supervision, direct or indirect, of the [putative worker's] work; (3) the [putative joint employer's] right, directly or indirectly, to hire, fire, or modify the [putative worker's] employment conditions; (4) the [putative joint employer's] power to determine the [putative worker's] pay rates or methods of payment; (5) the [putative joint employer's] preparation of payroll and payment of the worker's wages; (6) the [putative joint employer's] ownership of the facilities where the work occurred; (7) the [worker's] performance of a line-job integral to the [putative employer's] business; and (8) the [putative joint employer's] and [other entity's] relative investment in equipment and facilities.

*Id.* at 932. In applying these factors, courts are guided by several corollary principles. The first of these is that the focus is not on which of the two allegedly employing entities the alleged employee is most dependent; rather, the worker's relationship with each is examined to determine whether an employment relationship exists at all. Second, no one factor is determinative, as the economic realities test is dependent for determination on the totality of all the circumstances. Third, these factors are indicative of economic dependence of the worker on the alleged employer, since dependence is the hallmark of the employment relationship, and economic dependence, or lack thereof, depends upon the facts of each case. Fourth, there is no mathematical precision to the application of the above factors; some of the factors may be absent or inapplicable, and others may simply be neutral. Yet their totality in application is upon what an assessment of joint dependence is based. Fifth, the use of the common law definitions of employment do not control, but may be relied upon to define the realities of economic dependence. And finally, since the FLSA is in fact a humanitarian statute, the factors must be construed broadly. Thus, each factor must initially be weighed separately, then "collectively and

qualitatively" to determine whether Jimenez, notwithstanding any alleged employment relationship with Contreras and the car wash, was economically dependent upon SPI and therefore allegedly jointly employed by SPI and Contreras.

As to the first factor, the degree of control exercised by SPI over Jimenez, the answer is simple; there was none. SPI had absolutely nothing to do with the car wash, nor the engagement, payment, scheduling or anything else regarding Jimenez. In fact, Kent did not even know that Jimenez existed prior to the filing of this lawsuit (A. 3, p. 5).

The second factor, the degree of supervision of Jimenez's work, is not present either. This factor is similar to the first factor, and involves "overseeing [Jimenez's] work and providing directions." *Antenor, supra,* 88 F.3d at 934. Assuming *arguendo* that Jimenez was even supervised by anybody, which he in fact was not, *see infra* at pp. 17-18, the only connection which SPI had with Jimenez is the fact that it employed Contreras as a valet manager, and Contreras engaged Jimenez to wash cars at the same building where Contreras acted as a valet manager for SPI. However, Contreras totally separated his duties for SPI from the car wash business, as demonstrated above. This connection is simply far too tenuous to implicate that Jimenez was in any fashion economically dependent upon SPI. *Aimable v. Long & Scott Farms,* 20 F.3d 434, 441-442 (11th Cir. 1994)(even where there was some minimal supervision by putative joint employer vegetable grower, supervision was insufficient in degree to indicate joint employer status for grower). *See also, Beck v. Boce Group, LLC,* 391 F.Supp.2d 1183, 1188 (S.D. Fla. 2005)(no evidence that employee leasing company ever supervised any of the leased employees' work); *Jeanneret v. Aron's East Coast Towing, Inc.,* 2002 WL 32114470 (S.D. Fla. 2002)(same).

The third and fourth factors are also simply not present in the instant case. SPI had absolutely nothing to do with Jimenez's engagement to wash cars, his rate of pay, or his working conditions. Indeed, in reality, Jimenez actually not only negotiated his rate of pay solely with Contreras, but it had nothing to do with what Contreras was paid by SPI. Instead, it was based on the number of cars Jimenez had to wash, which dictated the number of hours he worked, and when the vehicle owners paid Contreras, he paid Jimenez (SOF ¶ 10; A. 1, pp. 11, 12, 14, 18). The working conditions were beyond anyone's control since neither SPI nor Contreras owned the worksite. *Aimable, supra*, 20 F.3d at 442.

As to the fifth factor, the record evidence is clear that SPI had absolutely nothing to do with paying Jimenez. SPI collects full documentation on its employees and pays them through a payroll company (SOF ¶ 11). Jimenez never presented himself to the SPI offices either to fill out an application or to be put on its payroll (SOF ¶ 7). SPI never had its payroll company cut Jimenez any payroll check (SOF ¶ 11). Jimenez was paid in cash by Contreras, with the exception of once or twice when Contreras paid him out of Contreras's personal checking account (SOF ¶ 18.)

The sixth factor is neutral, as neither SPI nor Contreras owned the job site where Jimenez performed the work (SOF ¶ 1). Therefore, it has no weight in the instant analysis. *Beck, supra,* 391 F.Supp.2d at 1191-1192.

The remaining factors further the conclusion that SPI never employed Jimenez. Jimenez washed cars. SPI was responsible for taking the cars from its customers' residents and guests and parking them. As discussed above, these businesses are not interdependent, and one could easily exist without the other; indeed, SPI does not provide car washing services as part of its business. Thus, even though Jimenez admittedly performs an unskilled and routine task, it is

clearly not for SPI's benefit. And finally, SPI neither invested in nor provided in any equipment necessary to the car wash. The investment was hardly more than *de minimis* in any case; soap, wax, a hose and some brushes. SPI provided none of it, nor contributed any money toward it (SOF ¶ 15). The only rational conclusion that could be drawn from the totality of this evidence is that SPI never employed Jimenez to any degree, and thus was not a joint employer with the car wash, assuming *arguendo* that the car wash even employed Jimenez. *Aimable*, *supra*, 20 F.3d at 445 (totality of evidence demonstrated economic dependence only upon the labor contractor and not the farm); *Beck*, *supra*, 391 F.Supp.2d at 1192 (totality of evidence demonstrated economic dependence only upon site employer and not employee leasing company); *Jeanneret*, *supra*, 2002 WL 32114470 at *9 (totality of economic realities test factors demonstrate that employee was not economically dependent on employee leasing company and thus no joint employment relationship shown with owner of towing business to which it leased employees); *Nelson v. Long Lines, Ltd.*, 335 F.Supp.2d 944, 965-967 (N.D. Iowa 2004)(holding company not joint employer with resort owned by it because economic realities test not met). And since the car wash did not gross anywhere near the $500,000.00 annual revenues required to qualify as an enterprise (SOF ¶ 21), all Defendants are entitled to summary judgment on this issue as well.

### E. The Car Wash Was Not Engaged in Commerce and Therefore Was Not an Employer Under the FLSA

Since Jimenez fails to bring himself within the protections of the FLSA through the enterprise concept, he has the burden of proving that he is covered through traditional application of the commerce test. The FLSA distinguishes between traditional and enterprise coverage: an enterprise's coverage is much broader, and includes being "engaged in commerce or in the production of goods for commerce" under § 3(s). In turn, "production of goods for commerce" is broadly defined, and includes having employees "handling, selling, or otherwise working on

goods or materials that have been moved in or produced for commerce by any person…." Traditional, non-enterprise coverage, however, depends on the alleged employee's individual activities, and not on the putative employer's business. *Wirtz v. Welfare Finance Corp.*, 263 F.Supp. 229, 233 (D.C.W.Va. 1967), citing *Overstreet v. North Shore Corp.*, 318 U.S. 125 (1943). Thus, the putative employee must be engaged in "an activity being directly essential to the production of goods for commerce or on the actual production of goods for commerce in order to subject an individual employee to coverage." *Wirtz, id.* at 234. It is the putative employee's burden to show as an element of his FLSA claim that his activities place him within the FLSA's coverage on the basis that he is engaged in an activity which is directly related to commerce. *Tripodi v. Microculture, Inc.*, 397 F.Supp. 1308, 1314 (D. Utah 2005). "The question whether an employee is engaged 'in commerce' within the meaning of the [FLSA] is determined by practical considerations, not by technical conceptions." *Mitchell v. C.W. Vollmer & Co.*, 349 U.S. 427, 429 (1955). In the instant case, Jimenez's activities consisted of washing cars brought to the situs of the 6000 building of Williams Island in Miami, Florida. He washed the vehicles, using some equipment supplied by Contreras and purchased wholly within Florida, as well as whatever materials Jimenez himself felt necessary to facilitate his work (SOF ¶ 15). Jimenez did not drive the vehicles except, on occasion, within the parking structure at the 6000 building itself. This case is strikingly similar to *Lenca v. Laran Enterprises, Inc.*, 388 F.Supp. 782 (N.D. Ill. 1974), in which a commercial janitor's work was held to have too insubstantial an effect on commerce to be covered. The court held:

> A review of cases indicates that a residential or commercial janitor's work does not substantially affect interstate commerce. In their memoranda plaintiffs cite many factors in an attempt to show plaintiffs' influence on interstate commerce; i.e., use of supplies such as cleaning compounds, light bulbs, plumbing repair parts which traveled in interstate commerce; use of the telephone in

> speaking with prospective tenants from out of state; delivery of tenant's mail, etc. However, none of these activities is of such character to have any significant impact on interstate commerce.

*Id.* at 784-785 (collecting cases). In the instant case, Jimenez basically did the same kind of work, with the exception of speaking on the telephone to individuals out of state or delivering tenants' mail, which of course was not integral to his job of washing cars. Thus, Jimenez was not himself engaged in any activities while working at the car wash which would affect commerce in a substantially sufficient fashion to bring him within the coverage of the FLSA. *Id.* *See also, Tripodi, supra,* 397 F.Supp.2d at 1308 (whether employee's activities were sufficiently related to commerce was "close question" where employee did not mail or transmit outside the state, made in-state bank deposits for services performed in state, and completed insurance forms for services performed in state and delivered to persons in state, but purportedly personally dealt with out of state company on a weekly basis regarding plates used in the business). Contreras is entitled to summary judgment on Jimenez's claims as a result.

**F. Jimenez Was an Independent Contractor**

Even assuming *arguendo* that Jimenez was sufficiently engaged in commerce in the performance of his work at the car wash, which Defendants of course deny, Jimenez is still without the ambit of the FLSA inasmuch as he was not an employee, but an independent contractor.

> The FLSA does not apply to independent contractors. Courts must therefore determine whether one is, as a matter of economic reality, an employee who is afforded the protections of the FLSA, or an independent contractor, who is not [citation omitted]. Courts look to a number of factors to make this determination: (1) the nature and extent of the employer's control over the manner in which the work was to be performed; (2) the extent that the employee could control his profit or loss based upon his skill level; (3) the employee's investment in equipment, materials, or his employ of other employees to complete the job;

> (4) whether a special skill is required to complete the job; (5) the degree of permanency and duration of the working relationship; (6) how integral the employee's job is to the employer's business; and most significantly, (7) whether the employee is economically dependent on the employment [citation omitted]. These factors are a guide; the existence of any one factor is not determinative. As such, these factors allow the 'economic reality rather than the 'technical concepts' to be the test of employment….[citation omitted].

*Murray v. Playmaker Services, LLC,* 512 F.Supp.2d 1273, 1276-1277 (S.D. Fla. 2007). The test for whether Jimenez was actually employed by Contreras, then, is an economic realities test similar in kind and degree to that for determining joint employer status. *Cf., Aimable v. Long & Scott Farms, supra*, 20 F.3d at 434 (court used 11 factors to determine independent contractor status, which factors vary and are within the discretion of the court, but ultimate test is whether under all factors considered, the totality of the circumstances illustrates economic dependency upon employer). And as with the application of the economic realities test to the instant case which demonstrated that SPI and the car wash were not joint employers, the application of the same test using similar but different factors demonstrates the same outcome as a matter of law must obtain on the issue of whether Jimenez was an independent contractor.

As to the first factor, the record evidence demonstrates that Contreras had very little, if any, control over Jimenez. As customers would request that their cars be washed, Contreras would put their vehicles on a list, and leave it for Jimenez (SOF ¶ 16). Jimenez was not bound to wash the listed vehicles in any particular order. Jimenez had no set schedule, and would come and go as he pleased. Further, Contreras did not supervise Jimenez's work or tell him how to wash the cars. At most, if a customer pointed out a special request to Contreras, such as a stain which the customer wanted removed, Contreras simply pointed out that information to Jimenez

(SOF ¶ 16). In fact, Jimenez did the majority of his work on the weekends, when Contreras was not even there (SOF ¶ 16).

Regarding the second factor, Jimenez was without a doubt an unskilled laborer. On the other hand, so was Contreras. Contreras would help Jimenez wash the cars if he had the time (SOF ¶ 16). Yet, as Contreras explained to Jimenez when Jimenez first approached Contreras about working as a car washer, while Jimenez demanded to work 70 hours per week, Contreras told him that although he could not make that promise, if Jimenez did a good job he would get more customers (SOF ¶ 10; A. 1, p.11). Thus, how much work Jimenez had depended on how good a job he did.

Further to the second factor, Contreras wanted to pay Jimenez by the car and initially proposed such an arrangement (SOF ¶ 10). It was Jimenez who insisted on being paid by the hour. Nevertheless, the amount of work still depended on how many cars were available to wash. And Contreras was paid the same way; he charged $15.00 per car, and assuming it took one hour to wash one car, then Contreras made $7.00 to Jimenez's $8.00 (SOF ¶ 10; A. 1, p. 11-12). Obviously, if it took Jimenez longer than one hour to wash one vehicle, he still got his $8.00 but Contreras would get less. Thus, Jimenez, not Contreras, controlled the profits, and only Contreras would realize any losses by making less per hour the longer it took Jimenez to wash a particular vehicle.

The third factor is at best a draw. Contreras provided soap, wax, hoses and other cleaning materials, but Jimenez brought along gloves or sponges or whatever would "facilitate his work" (SOF ¶ 15). At best, the investment on both men's parts was minimal This factor, then, is neutral to the determination. *Murray*, *id.*, at 1278-1279.

The fourth factor is related in the instant case to the second. As to the car wash, both Contreras and Jimenez were unskilled laborers. And while this may militate against a finding that Jimenez was an independent contractor in a different case, it is less important here because, by Jimenez's admission, he worked at cleaning jobs both before and after he worked at the car wash. Thus, in the overall consideration of the totality of the circumstances, this factor does not come into play in the determination as to whether Jimenez was economically dependent upon the car wash. The fifth and sixth factors are far more telling. Jimenez was with the car wash for only ten months. This short period militates against an employment relationship. *Murray, id.* at 1279. And although Jimenez's job was in fact the sole activity performed by the car wash, he was not the only one to perform it (SOF ¶ 20). Thus, while viewed as a group, all of the car washers, including Contreras, were integral to the work of the car wash, but it is not necessarily the case that Jimenez by himself was. Indeed, according to Jimenez, his resignation was engendered by the fact that he had been out ill for two or three days and when he returned, there were two other people working the car wash (A. 4, p. 21).

Viewing the above factors in totality, it is evident that despite his protestation otherwise,[6] Jimenez was not economically dependent upon the car wash. Indeed, prior to working at the car wash he worked for Hospitality Staffing Solutions, which was a supplier of contract labor (A. 4, p. 6), and sued that entity for overtime violations as well (A. 4, p.6). Moreover, there were other times that other individuals were working at the car wash and Jimenez did not resign (A. 4, pp. 39-40). While Jimenez claims that these individuals only lasted for two or three days, he did not know the individuals who were working there when he came back from being ill (A. 4, p. 22). Most significantly, not only did Jimenez quit voluntarily ostensibly because he felt that these

[6] Jimenez testified that he quit because he depended upon the wages he made at the car wash to "sustain myself as well as sustain my family in my country; and being the same amount of cars per week, then the salary would be split in three, and I was not going to cover my needs.: (A.4, pp. 21-22).

people whom he did not know would be detracting from his income, he began working for another contract labor operation that provides cleaning people to various buildings (A. 4, pp. 22-23). Accordingly, the totality of the evidence shows unequivocally that Jimenez was able to find a market for his unskilled labor quite readily, and made his own decisions about working at the car wash initially, his working conditions and pay while he worked there, and his decision to leave. It is therefore inescapable that, under the economic realities test, as a matter of law Jimenez was not nearly sufficiently economically dependent upon the car wash to make him an employee. Thus, Defendant Contreras is entitled to summary judgment on this issue as well. *Cf.*, *Santelices v. Cable Wiring and South Fla. Cable Contractors, Inc.,* 147 F.Supp.2d 1313,1323-1324 (S.D. Fla. 2001)(independent contractor status not found where, unlike in present case, individual did not retain substantial control over meaningful parts of business relationship such as hours worked, compliance with putative employer's specifications, had no hand in developing business, required to pay employer for use of radio equipment, and performance of services were limited); *Usery v. Pilgrim Equipment Co.,* 527 F.2d 1308,1312-1313 (5th Cir. 1976).

**G. Conclusion**

For the foregoing reasons, based on the material facts of record as to which there is no genuine issue to be tried, all Defendants, SOUTHERN PARKING, INC.; WILLIAM KENT; and JOSE A. CONTRERAS, are entitled to judgment as a matter of law on all of the Plaintiff ROGER JIMENEZ's claims. Accordingly, Defendants respectfully request that they be granted summary judgment in full against Plaintiff, and be awarded such other and further relief as the Court shall deem just and reasonable.

**[SIGNATURE BLOCK ON FOLLOWING PAGE]**

Respectfully submitted,

SUSAN L. DOLIN, P.A.
**Counsel for Defendants**
9000 Sheridan Street
Suite 93
Pembroke Pines, FL 33024
Tel: 954-862-2284
Fax: 954-862-2287
Email: sdolin@dolinlawgroup.com

By: s/ Susan L. Dolin, Esq.
Susan L. Dolin, Esq.
Fla. Bar No. 708690

## CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing upon all counsel and unrepresented parties, as well as other interested persons authorized to receive electronic filings on the attached service list through the Court's CM/ECF system, and upon those not so authorized by the means indicated on the attached service list, this 25th day of July, 2008.

Respectfully submitted,

SUSAN L. DOLIN, P.A.
**Counsel for Defendants**
9000 Sheridan Street
Suite 93
Pembroke Pines, FL 33024
Tel.: 954-862-2284
Fax: 954-862-2287
E-mail: sdolin@dolinlawgroup.com
By: s/ Susan L. Dolin
FBN: 708690

and

BRADLEY S. HARTMAN, Esq.
FBN: 276219
BRADLEY S. HARTMAN, P.A.
10000 Stirling Road, Suite 1
Cooper City, FL 33024-8038
Telephone: 954-438-1000
Facsimile: 954-438-3000
**Co-counsel for Defendants**

**SERVICE LIST**

**Jimenez v. Southern Parking, Inc. *et al***
**UNITES STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 07-23156**

Susan L. Dolin, Esq., FBN 708690
SUSAN L. DOLIN, P.A.
9000 Sheridan Street
Suite 93
Pembroke Pines, FL 33024
Telephone: 954-862-2284
Facsimile: 954-862-2287
E-mail: sdolinlaw@aol.com
**Counsel for Defendants**
*Via CM/ECF*

Bradley S. Hartman, Esq., FBN 276219
BRADLEY S. HARTMAN, P.A.
10000 Stirling Road, Suite 1
Cooper City, FL 33024-8038
Telephone: 954-438-1000
Facsimile: 954-438-3000
E-mail: brad@hartmanlawoffice.com
**Co-counsel for Defendants**
*Via CM/ECF*

J.H. Zidell, Esq., FBN 0010121
J.H. Zidell, P.A.
300 71st Street
Suite 605
Miami Beach, FL 33141
Telephone: 305-865-6766
Facsimile: 305-865-7167
E-mail: zabogado@aol.com
**Counsel for Plaintiff**
*Via CM/ECF*